IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RICHARD ROJEM, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-10-172-M |
| | ) | |
| ANITA TRAMMELL, Warden, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Petitioner, Richard Rojem, a state court prisoner, has filed a Petition for Habeas Corpus Relief Pursuant to 28 U.S.C. § 2254. Doc. 41. This is Petitioner's second habeas petition.

In 1985, Petitioner was tried by jury in Washita County District Court Case No. CRF-84-35 for the kidnapping, rape, and murder of seven-year-old Layla Cummings. Petitioner was found guilty on all counts. For the kidnapping and rape, Petitioner received sentences of 1,000 years each. Petitioner was sentenced to death for the murder. In 1996, after an unsuccessful pursuit for relief in the state courts, Petitioner initiated his first habeas corpus action. In 1999, the Court denied Petitioner relief from his convictions. However, due to an instructional error, Petitioner was granted relief from his death sentence and the State was ordered to conduct a new capital-sentencing proceeding. Rojem v. Ward, Case No. CIV-96-

1337-M (W.D. Okla. Dec. 21, 1999) (unpublished). Both parties appealed the Court's ruling, and in 2001, the Tenth Circuit affirmed. Rojem v. Gibson, 245 F.3d 1130 (10th Cir. 2001).

Since 2001, Petitioner has had two state court resentencing proceedings. In both of these subsequent proceedings, Petitioner was sentenced to death. The resentencing ordered as a result of Petitioner's first habeas action was held in 2003. In Rojem v. State, 130 P.3d 287 (Okla. Crim. App. 2006), the OCCA found error in the second resentencing and ordered a third one. At the third resentencing held in 2007, the jury found three aggravating circumstances supporting Petitioner's death sentence: (1) Petitioner was previously convicted of a felony involving the use or threat of violence to the person; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution (O.R. 16, 3147).

In Case No. D-2007-660, Petitioner appealed from his third resentencing proceeding. In a published opinion, Rojem v. State, 207 P.3d 385 (Okla. Crim. App. 2009), the OCCA found no errors warranting relief. Although Petitioner sought review of the OCCA's decision by the United States Supreme Court, his petition for writ of certiorari was denied. Rojem v. Oklahoma, 558 U.S. 1120 (2010). Petitioner also filed a post-conviction application, which the OCCA denied in an unpublished opinion. Rojem v. State, No. PCD-2007-895 (Okla. Crim. App. June 23, 2009) (unpublished).

In his Petition, Petitioner has presented eight grounds for relief. Doc. 41. Respondent has responded to the Petition and Petitioner has replied. Docs. 49 and 64. Petitioner's

request for an evidentiary hearing has been denied. Doc. 66. After a thorough review of the state court record (which Respondent has provided), the pleadings filed herein, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Facts.

On August 17, 1978, seventeen-year-old Mary Leshniak was walking to her Michigan home when Petitioner came up from behind her, put a knife to her throat, and directed her to the basement of a new home under construction. In the basement, Petitioner committed sexual crimes against Ms. Leshniak. Ms. Leshniak was also brutally beaten. Although Petitioner threatened her not to leave the basement, Ms. Leshniak, naked and bleeding from her injuries, waited until she heard Petitioner leave before climbing out of the basement window and seeking help from a neighbor (Tr. III, 616-25).[1] Nine days later, sixteen-year-old Sheryl Boggs was walking to her Michigan home when Petitioner put a knife to her throat and walked her to a dark area of the VFW hall, where he committed several sex crimes against her. Unlike Ms. Leshniak, Petitioner eventually gave Ms. Boggs her clothes and let her go. Although Petitioner threatened to kill Ms. Boggs if she told anyone, she went home, told her family, and the police were contacted (Tr. III, 608-15).

---

[1] Petitioner's third resentencing proceeding is contained in five volumes of transcripts, with the exhibits fully comprising the fifth volume. Herein, citation to the third resentencing will simply be "Tr. Vol, page." The state district court original record will be cited as "O.R. Vol, page." Reference to additional transcripts will include the specific date of the transcribed proceeding, i.e., "Tr. 8/17/06, page."

Petitioner was prosecuted for his crimes against Ms. Leshniak and Ms. Boggs and he received a prison sentence of six to fifteen years (State's Exhibits 12 and 13). While in prison in Michigan, Petitioner met and married his cell mate's sister, Mindy Cummings. Ms. Cummings was Layla's mother (Tr. III, 586; Tr. IV, 851, 881, 1004-05). When Petitioner was released on parole in October of 1983, he came to Oklahoma (Tr. IV, 881-82, 885-86, 1004, 1039-40).

On July 7, 1984, Layla's body was found lying face down in a dirt field near Burns Flat, Oklahoma. Her pink nightgown was bloodstained, particularly around the crotch area. She had puncture wounds to her back and chest, both near the base of her neck. Panties (presumably hers) were stuffed into her mouth. Cellophane wrappings and a condom order form were found near and under her body (Tr. III, 580-84, 589-96; State's Exhibits 5-9). The medical examiner confirmed that Layla died as a result of stab wounds. Although Layla could have survived the back stab wound if promptly treated, the front stab wound, which extended four inches into her body and severed her subclavian artery, caused Layla to bleed to death (Tr. III, 518-34, 554; State's Exhibits 1 and 4). In addition to the stab wounds to her upper body, the medical examiner testified that Layla also had a three-inch stab wound in her vaginal area. This stab wound was in addition to the bruises to the vaginal area caused by blunt force (Tr. III, 534-44; State's Exhibits 2 and 4). Finally, although Layla did not die by asphyxiation, injuries to her left eye, tongue, upper lip, and voice box, indicated that Layla's airway had been partially compressed (Tr. III, 544-47; State's Exhibit 3).

Additional facts will be referenced herein as they relate to the individual grounds for relief raised by Petitioner.

## II.  Standard of Review.

### A.  Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity.  It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies.  As acknowledged in <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

### B.  Procedural Bar.

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" <u>Cone v. Bell</u>, 556 U.S. 449, 465 (2009) (quoting <u>Coleman</u>).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's

federal claims because the prisoner had failed to meet a state procedural requirement." <u>Coleman</u>, 501 U.S. at 729-30.

### C. Merits.

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the Court's authority to grant habeas corpus relief to state prisoners is limited. When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, the Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The focus of Section 2254(d) is on the reasonableness of the state court's decision. To obtain relief, a petitioner must show that the state court decision is "objectively unreasonable." <u>Williams v. Taylor</u>, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II). <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. ___, 131 S. Ct. 1388, 1398 (2011) (acknowledging that Section 2254(d) places a difficult burden of proof on the petitioner). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that

determination was unreasonable — a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Harrington v. Richter</u>, 562 U.S. 86, ___, 131 S. Ct. 770, 786 (2011). Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Id.</u> The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Id.</u> (citation omitted).

### III. Analysis.

### A. Ground One: Cruel and Unusual Punishment.

In his first ground for relief, Petitioner asserts that because he has yet to be executed for the murder he committed in 1985, he has been subjected to cruel and unusual punishment, and he should therefore be relieved of his death sentence. Petitioner acknowledges that this claim is unexhausted. Although Respondent does not waive exhaustion, she contends that the claim should be denied on the merits. The Court agrees with Respondent. <u>See</u> 28 U.S.C. § 2254(b)(2).

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. Asserting that his confinement conditions are "deplorable," "severe," and "dehumanizing," Petitioner claims that his death sentence cannot stand because his years on death row amount to unconstitutional "'psychological torture.'" Petition, p. 11 (quoting Furman v. Georgia, 408 U.S. 238, 288 (1972) (Brennan, J., concurring)). However, Petitioner fails to cite a single case where any court, much less the United States Supreme Court, has found an Eighth Amendment violation under these circumstances.

Although Petitioner has referenced the comments of certain Supreme Court justices who would support his quest for Eighth Amendment relief, these comments do not reflect the current state of the law. They are personal opinions of well-respected jurists, not Supreme Court holdings. The Supreme Court has been given multiple opportunities to address the issue, but yet it has repeatedly declined to take the issue up. See, e.g., Muhammad v. Florida, ___ U.S. ___, 134 S. Ct. 894 (2014) (denying certiorari and a stay of execution on a similar claim); Valle v. Florida, ___ U.S. ___, 132 S. Ct. 1 (2011) (denying certiorari and a stay of execution where petitioner had been on death row for thirty-three years); Johnson v. Bredesen, 558 U.S. 1067 (2009) (denying certiorari and a stay of execution where petitioner had been on death row for twenty-nine years); Allen v. Ornoski, 546 U.S. 1136 (2006) (denying certiorari and a stay of execution where petitioner was a wheelchair-confined, seventy-six-year-old blind diabetic who had been on death row for twenty-three years); Knight v. Florida, 528 U.S. 990 (1999) (denying certiorari where

petitioners had been on death row for twenty years or more); <u>Elledge v. Florida</u>, 525 U.S. 944 (1998) (denying certiorari where petitioner had been on death row for twenty-three years); <u>Lackey v. Texas</u>, 514 U.S. 1045 (1995) (denying certiorari where petitioner had been on death row for seventeen years).

In addition to the absence of Supreme Court authority, the Tenth Circuit has found that Petitioner's claim lacks merit. In <u>Stafford v. Ward</u>, 59 F.3d 1025, 1028 (10th Cir. 1995), the petitioner claimed that an Eighth Amendment violation resulted from his fifteen years on death row, "during which time he faced at least seven execution dates." In denying relief, the Tenth Circuit noted the absence of case law authority:

> To our knowledge, there is no reported federal case that has adopted the position advocated by Appellant. Although two Supreme Court justices have expressed the view that lower federal courts should grapple with this issue, those views do not constitute an endorsement of the legal theory, which has never commanded an affirmative statement by any justice, let alone a majority of the Court.

<u>Id.</u> (citation omitted). <u>See</u> <u>also</u> <u>Jones v. Gibson</u>, 206 F.3d 946, 959 n.6 (10th Cir. 2000) (citing <u>Stafford</u> and denying Eighth Amendment relief where the petitioner had been on death row for twenty years). Other circuits have found a lack of merit to the claim as well. In <u>Chambers v. Bowersox</u>, 157 F.3d 560, 568 (8th Cir. 1998), the petitioner had been on death row for fifteen years. In denying Eighth Amendment relief, the Eighth Circuit held as follows:

> We believe that delay in capital cases is too long. But delay, in large part, is a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's

life. Chambers's strongest argument is that the State has had to try him three times before getting it right. That is true, but there is no evidence, not even a claim, that the State has deliberately sought to convict Chambers invalidly in order to prolong the time before it could secure a valid conviction and execute him. We believe the State has been attempting in good faith to enforce its laws. Delay has come about because Chambers, of course with justification, has contested the judgments against him, and, on two occasions, has done so successfully. If it is not cruel and unusual punishment to execute someone after the electric chair malfunctioned the first time, see Louisiana *ex rel.* Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), we do not see how the present situation even begins to approach a constitutional violation.

Id. (footnote omitted). See also Thompson v. Sec.'y for Dept. of Corr., 517 F.3d 1279, 1283-84 (11th Cir. 2008) (finding no merit to prolonged confinement claim).

For the foregoing reasons, the Court finds that Petitioner is not entitled to relief on Ground One. Relief is therefore denied.

## B. Ground Two: Exclusion of Evidence.

In Ground Two, Petitioner claims that he is entitled to relief because the trial court excluded demonstrative slides prepared by one of his experts, Dr. Mark Cunningham. Alleging that the slides were essential to the jury's assessment of Dr. Cunningham's credibility and that their exclusion prevented him from presenting a complete picture of his social history, Petitioner contends that he has suffered an Eighth Amendment violation which requires relief.[2] Petitioner raised this claim on direct appeal. Although the OCCA

---

[2] Dr. Cunningham's testimony related to mitigation, i.e., what led Petitioner to make such bad choices in his life, and continuing threat, i.e., whether Petitioner would pose a danger in prison. The jury rejected the continuing threat aggravator, and Petitioner does not challenge this portion of Dr. Cunningham's testimony. Petitioner's only challenge herein is to the mitigation portion of Dr. Cunningham's testimony.

determined that the trial court erred in excluding the slides, it found that relief was unwarranted. Rojem, 207 P.3d at 389-92. In conjunction with the OCCA's holding, Respondent asserts that the error was in fact harmless and that under the standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), this Court must deny relief. For the reasons set forth below, the Court agrees with Respondent.

In denying Petitioner relief, the OCCA detailed the facts and circumstances surrounding the presentation and ultimate exclusion of the slides. Having reviewed the record, the Court finds that the following passage from the OCCA's decision is an accurate statement of the facts and circumstances giving rise to Petitioner's claim. See 28 U.S.C. § 2254(e)(1).

> [Petitioner's] primary expert witness was Dr. Cunningham, a forensic psychologist. Cunningham created a developmental profile for [Petitioner] explaining the formative basis for his decision-making, as well as a risk assessment profile to determine his potential for future dangerousness in prison. To assist in forming and expressing his opinions, Cunningham used as a model a nationally-known study done by the United States Department of Justice (DOJ) which is used in federal and state courts and by researchers nationwide. Cunningham and defense counsel intended to present his testimony by means of question and answer using as a demonstrative aid a PowerPoint presentation. The PowerPoint slides, offered as defense exhibits 20 and 21, contained explanations of the processes Cunningham used in forming his opinions, the results of his interviews and examinations surrounding [Petitioner], and his conclusions. The slides were designed in PowerPoint "bullet" fashion, allowing more information to appear on the screen as the witness reached different points in his testimony. Several slides, referring to the study Cunningham used as his model, contained a reference to the United States Department of Justice, which promulgated the study. The State had notice of this demonstrative aid, which necessarily contained hearsay from the interviews on which Cunningham based his opinions and conclusions. The State's only objection to the PowerPoint was the possibility that jurors

might have it as a separate exhibit; [Petitioner] agreed and did not seek to admit the PowerPoint or its printed versions for jurors to use in deliberations.

Cunningham began his testimony by explaining the nature of his research and analysis regarding both developmental decision-making factors and risk assessment. Defense counsel asked him if this wasn't just a fancy mumbo-jumbo excuse and Cunningham replied, "Not according to the U.S. Department of Justice." The trial court stopped the proceedings. Defense counsel attempted several times to explain that Cunningham was merely referring to a study used nationwide, created by the Justice Department, and did not plan to discuss either the DOJ or federal law during the course of the trial. The record suggests that the trial court may not have listened to these explanations and did not understand them. The court stated several times, insistently, that counsel was injecting federal law into the case and he wanted no mention of the DOJ in the courtroom in any form. Counsel agreed and resumed direct examination with the PowerPoint slides. Almost immediately a written reference to the DOJ appeared, and the trial court stopped proceedings again, ruling that Cunningham could not use any slides which referred to the DOJ. Defense counsel asked for a brief continuance or early lunch to redact the slides and the trial court refused. Cunningham said he believed he could do it within a couple of minutes. The trial court agreed to wait briefly, but then threatened to strike the entire testimony. Cunningham stated he believed he had removed all DOJ references from the PowerPoint, but the trial court saw one intact. The court stated the trial was being delayed and ruled that Cunningham and defense counsel could not use the PowerPoint as a demonstrative aid for the jury. The court ruled that counsel could proceed by asking questions based on Cunningham's study in a question-and-answer format, with no reference to the DOJ. Counsel, who had prepared for Cunningham's testimony using the PowerPoint, asked for a brief continuance to consult Cunningham regarding a question-and-answer process without the slides. This request was denied. [Petitioner's] later request for a mistrial based on these rulings was denied.

Rojem, 207 P.3d at 389-90 (footnote omitted).

Acknowledging Petitioner's right to present a defense and finding that the slides were both relevant and otherwise admissible, the OCCA searched the record in an attempt to find

support for the trial court's exclusion of the evidence.  Id. at 390-91.  However, finding "no

basis in the record for the trial court's ruling[,]" the OCCA held as follows:

> The record does not reflect that any federal law, or the law of any other
> jurisdiction, was referred to in any way by either party, Cunningham or any
> other witness. The State suggests that the trial court prohibited the PowerPoint
> demonstrative aid because the court was afraid reference to the DOJ model
> would confuse the jury's understanding of Oklahoma law, particularly
> concerning the continuing threat aggravating circumstance. Nothing in the
> record supports this assertion. The trial court's concern was clearly and
> vigorously expressed several times: the court believed that any reference to the
> U.S. Department of Justice was a reference to federal law generally, not as
> applied to any issue in the trial, and he would not permit it. The trial court
> never suggested jury confusion was an issue or concern in the case, and the
> record does not support any conclusion that the jury would have been misled
> by the PowerPoint presentation.
>
> There is more basis in the record for the State's suggestion that the trial
> court was already unhappy because there had been several delays in the trial
> during the defense case. However, in order to address the trial court's concerns
> trial counsel asked for an early lunch, a continuance of a few minutes, and a
> brief moment to speak with his witness. None of these requests would have
> significantly delayed the trial. The first and third requests were denied and the
> second was granted but truncated. The trial court may well have been
> frustrated by defense counsel's difficulties in managing trial time and witness
> appearances. That frustration is no excuse for the blanket prohibition of
> relevant and admissible demonstrative evidence.

Id. at 391.

Although the OCCA used Petitioner's case to "strongly caution[]" trial courts "to take

care in prohibiting defense exhibits on mitigating evidence during the second stage of a

capital trial[,]" it determined that the error in Petitioner's case did not warrant relief.  Id. at

392.

13

First, insofar as Cunningham's evidence was directed to the question of whether [Petitioner] was a continuing threat, the testimony was effective. The jury found three other aggravating circumstances but did not find that [Petitioner] presented a potential continuing threat to society.

Cunningham's evidence was designed to do more than address the issue of continuing threat; the bulk of the presentation went to mitigation. We turn to the question of whether [Petitioner] was prejudiced by the limited presentation of Cunningham's research and conclusion on the issue of development and decision-making. [Petitioner] claims that the exclusion of the information on the PowerPoint slides was unfairly prejudicial. He argues that the slides contained significantly more information than could be presented in oral question-and-answer form, and that counsel was unable to cover all the material present on the slides. He claims Cunningham was unable to present [Petitioner's] complete social history without use of the demonstrative aid. Although in some areas the PowerPoint presentation contained more detail, the record shows that Cunningham presented ample oral testimony of [Petitioner's] early childhood development as well as his behavior while incarcerated. Cunningham discussed at length [Petitioner's] family background with alcoholism, violence, conflict and anger, including abuse directed at [Petitioner]. Cunningham mentioned [Petitioner's] chaotic childhood household more than once, specifically testifying that the household had thirteen to fifteen people living in a 1500 square foot home. Throughout his testimony Cunningham emphasized the widespread family problems created by alcohol, and the resulting violence. Cunningham did not give details of alleged sexual abuse suffered by [Petitioner] as a child, but did allude to it in his testimony. Cunningham also spoke of other family problems, the violent death of [Petitioner's] father, the poor parenting and role models [Petitioner] experienced, his difficulties in school, the effects of poverty, complications in [Petitioner's] gestation and birth, his subsequent early childhood surgery and years in a body cast, and adverse genetic predispositions. [Petitioner's] mother also testified regarding her pregnancy, [Petitioner's] premature birth and physical problems, the chaotic household conditions, and family alcoholism and conflict. [Petitioner's] high school girlfriend testified that the family often got drunk together, were belligerent and fought.

As [Petitioner] notes, the trial court's ruling prevented Cunningham from explaining to the jury the underlying basis of his opinion, as it rested on the information found in the DOJ study and he was not allowed to refer to that study. Although an expert must disclose these bases if asked by either party,

both parties were prohibited from asking Cunningham the basis of his opinion. This may have hindered jurors' assessment of the credibility of Cunningham's conclusions. However, jurors did hear that Cunningham relied on a nationally known and accepted study, and were able to assess his credibility through his testimony.

While we find that the trial court abused its discretion in refusing to allow [Petitioner's] expert witness to use demonstrative aids during his testimony, Cunningham and other witnesses were able to present a great deal of information regarding [Petitioner's] development and factors related to his ability to make good decisions. The record shows that jurors were able to use this information in their deliberations. For that reason, this Court finds that the trial court's error does not require relief.

Id. at 391-92 (footnote omitted).

Although Petitioner has questioned whether the OCCA's decision is a decision on the merits to which AEDPA deference must be given, Petitioner ultimately acknowledges, as Respondent asserts, that his entitlement to relief rests upon his showing that the trial court's exclusion of Dr. Cunningham's slides "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 631 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). See Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (the Brecht standard applies to Section 2254 cases regardless of whether the state court recognized the error and reviewed it under Chapman v. California, 386 U.S. 18 (1967)).[3] "[A] 'substantial

---

[3] In Fry, 551 U.S. at 119-20, the Supreme Court found that the AEDPA did not supplant the Brecht standard, but that the Brecht standard subsumed "the more liberal AEDPA/Chapman standard which requires only that that state court's harmless-beyond-a-reasonable-doubt determination be unreasonable." See DeRosa v. Workman, 679 F.3d 1196, 1233 (10th Cir. 2012) (acknowledging Fry and finding that even if the OCCA erred in applying Chapman, "[it is] bound to apply 'the more forgiving standard of review' outlined in Brecht . . . ."). See also Lockett v. Trammel [sic], 711 F.3d 1218, 1232 (10th Cir. 2013) (where the State concedes the constitutional error, the sole issue on habeas review is whether the error was harmless under Brecht).

and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." Bland v. Sirmons, 459 F.3d 999, 1009 (10th Cir. 2006) (quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995)). "'Grave doubt' exists where the issue of harmlessness is 'so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error.'" Id. at 1009-10 (quoting O'Neal, 513 U.S. at 435). For the following reasons, the Court finds that the exclusion of Dr. Cunningham's slides did not have a substantial and injurious effect on the jury's verdict.

Although Petitioner contends that the exclusion of the slides affected Dr. Cunningham's credibility and the jury's ability to assess the same, the Court finds that the jury was well-aware of Dr. Cunningham's education and experience in clinical and forensic psychology. In addition to his curriculum vitae which was entered into evidence as Defendant's Exhibit 19, Dr. Cunningham testified he had been a psychologist for thirty years; that he was licensed in fifteen states and practiced nationally; that his work had garnered national attention with awards and distinctions; that he was one of 230 psychologists who were board certified in forensic psychology; that he been published in peer-reviewed journals and scholarly textbooks; that he was a frequent presenter and educator; and that he had testified over 200 times (125 times in capital sentence proceedings) and had been recognized as an expert in each of those cases (Tr. IV, 899-912). In addition, although the trial court did not allow Dr. Cunningham to reference his reliance on the DOJ study, Dr. Cunningham repeatedly testified that his opinion testimony was based on studies and research widely

accepted in the psychological community (Tr. IV, 939, 948, 954-55, 970).  Thus, even without the slides, it was apparent to the jury that Dr. Cunningham was a qualified expert.

Beyond the credibility issue, it is equally clear that even without the slides, Dr. Cunningham was able to convey the poignant points of his mitigation-related testimony. Dr. Cunningham testified that he not only conducted an in-depth interview of Petitioner, but that he interviewed several of Petitioner's relatives as well (Tr. IV, 914-16).  In addition to personal interviews, Dr. Cunningham testified that he reviewed numerous records relating to Petitioner, including medical records, schools records, military records, criminal records, and incarceration records (Tr. IV, 916-17).  The crux of Dr. Cunningham's testimony was that a person's history, experiences, and background affect the choices they make. Dr. Cunningham stressed that a person's past does not excuse their criminal behavior, but it is nevertheless relevant to the issue of moral culpability.  Dr. Cunningham acknowledged that every criminal defendant has a choice, but moral culpability is consideration of "the idea that we don't all come to our choices out of a level playing field" (Tr. IV, 917-18, 928-30).[4]

_____

[4] Later in his testimony, Dr. Cunningham elaborated on the issue of moral culpability as follows:

> Moral culpability is the idea that we do not all come to our choices and our conduct out of a level playing field.  And that the things that - - - that form you or, or damage you as you are growing up, affect how you perceive your choices, affect your value system, affect your ability to ultimately control yourself.

> And it's because of those differences in people's background and the differences that they bring to their conduct that the punishment might be different from one person to another who had committed the same act, because their moral

Dr. Cunningham discussed an ideal foundation for making the most positive choices, which included an intact family, acceptance and affirmation, stability, structure, consistency, modeling of positive values, and positive peer relationships.  Using the ideal foundation model, which Dr. Cunningham was allowed to illustrate by the slides he had prepared, Dr. Cunningham also discussed how weaknesses in any of these areas could influence decisionmaking (Tr. IV, 930-38; Defendant's Exhibit 21, pp. 1-3).  From this point on, further reference to the slides was not permitted.  However, Dr. Cunningham continued his discussion with reference to Petitioner particularly, explaining to the jury how Petitioner lacked protective factors while possessing many risk factors (Tr. IV, 947-75).

Regarding protective factors and risk factors, Dr. Cunningham explained, again with reference to the slides that had been shown to the jury, that risk factors are "factors that increase the likelihood of criminal choices and delinquency," whereas protective factors are "things that would tend to lower the ramp, or stand between this person and the bad outcomes" (Tr. IV, 947-48).  Dr. Cunningham testified that Petitioner had none of the four primary protective factors, i.e., he was not female, he was not really smart, he did not have a positive social orientation, and he was not resilient (Tr. IV, 948-51).  Dr. Cunningham also noted the absence of other protective factors.  Dr. Cunningham testified that protective

---

culpability is different.  How they got there, the raw material they had to work with, were different.

(Tr. IV, 947).

18

factors are those things which act as a buffer to risk factors. Therefore, if a person has no protective factors, like Petitioner, he has greater exposure to risk factors (Tr. IV, 951-53).

As to risk factors, Dr. Cunningham first described the risk factors that were present in Petitioner's life from conception to age six, namely: perinatal difficulties (including a difficult pregnancy, premature birth, and low birth weight); a birth deformity (which required surgery to treat and a body cast until age three); family alcoholism (on both sides of the family); and family management problems (teenage biological parents with chronic conflict between them; living with his mother and stepfather, who both drank and fought often; and living in a chaotic, 1,500-square-foot home shared with thirteen to fifteen others) (Tr. IV, 954-60). Dr. Cunningham testified that the "first six years of life are critically important . . . [because] [t]hat's when the concrete is the wettest." He then continued:

> That's where the influences, how much stability and quality of relationship and consistency, that's the time when you're laying the foundation of who this person is going to be from now on.
>
> And shortly after, it's like the framework is starting to go up. And so if those early years, if the first one to six years of life of [sic] are damaging, you get cracks in the foundation. Now the structure that everything else is going to be built on is rendered unstable.

(Tr. IV, 957).

Next, Dr. Cunningham testified about the risk factors present in Petitioner's life from age six to adolescence. Although many of the same risk factors identified in early life continued as Petitioner grew up, Dr. Cunningham noted the following additional risk factors that impacted Petitioner: economic deprivation; transitions in mobility (people moving in

and out of the household); academic failure (Petitioner dropped out of high school in the tenth grade); media portrayals of violence; Petitioner's testicle injury and surgery at age thirteen; sexual incidents while growing up; significant genetic predispositions to drug or alcohol abuse and psychological and personality disorders; generational dysfunction in his family system; and the death of Petitioner's biological father in a bar fight (Tr. IV, 960-71).

Given the absence of protective factors and the presence of numerous risk factors in Petitioner's life, Dr. Cunningham's ultimate conclusion was that he was not at all surprised that Petitioner ended up in the criminal system. Based on his history, Petitioner was clearly at a significant risk for criminal activity. Again, however, Dr. Cunningham emphasized that his conclusions did not excuse Petitioner's behavior. The very purpose of his testimony was to "help explain and illuminate the ground from which [Petitioner] made the tragic choices that he did" (Tr. IV, 962-63, 965, 971-75). Complementing this testimony was Dr. Cunningham's further opinion that despite his history and criminal behavior, Petitioner had adjusted to prison life and had a low probability for being a continuing threat in prison society (Tr. IV, 975-91).

In light of the testimony that was presented regarding Dr. Cunningham's experience and expertise, as well as the substance of his mitigation testimony and its scientific basis, the Court finds that the absence of the slides did not have a substantial and injurious effect on the jury's sentence of death. Brecht, 507 U.S. at 631. This conclusion is bolstered by the Court's additional determinations that Dr. Cunningham was a solid, confident witness who

exuded excellence and professionalism, and while his testimony was far from novel and largely within the jury's common experience (that a criminal defendant is most often the product of a difficult upbringing), his delivery and explanation of this mitigating evidence from a scientific perspective was both enlightening and authoritative. Petitioner's Ground Two is therefore denied.

### C.    Ground Three:    Residual Doubt Evidence.

In Ground Three, Petitioner asserts that he should have been allowed to present DNA evidence at his third resentencing proceeding. Petitioner takes issue with the OCCA's determination that the evidence was residual doubt evidence which was inadmissible in a resentencing proceeding, and he asserts that he has suffered an Eighth Amendment violation which warrants relief. Because the Supreme Court has never held that the Eighth Amendment affords a defendant the right to present residual doubt evidence at sentencing, the Court finds that Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

The evidence at issue is testimony from a defense expert that DNA testing of the victim's fingernails excluded Petitioner as a donor. At Petitioner's second resentencing, Petitioner presented this evidence through Brian Wraxall, a forensic serologist. Mr. Wraxall testified that in 2001 he conducted DNA testing of the material adhering to the victim's fingernails. Although Mr. Wraxall determined that the victim was the primary donor of the

analyzed DNA, Mr. Wraxall did find the presence of some male DNA which Petitioner could

not have provided (Tr. 7/21/03, 678, 681-83, 689-90, 694-98).[5]

In Petitioner's appeal of his second resentencing proceeding, the OCCA granted relief

on other grounds, but it nevertheless offered guidance concerning the admission of residual

doubt evidence in Petitioner's third resentencing proceeding. Rojem, 130 P.3d at 298-99.

Referencing the Supreme Court's decision in Franklin v. Lynaugh, 487 U.S. 164, 172-

74 (1988), the OCCA noted that "[t]he Supreme Court has expressed sincere doubts, albeit

in a plurality opinion, that the constitution requires a jury instruction in a capital sentencing

trial to cover the issue of residual or lingering doubt as a possible mitigating factor." Rojem,

130 P.3d at 298. The OCCA also acknowledged the unique circumstances of a capital

resentencing proceeding.

> But resentencing proceedings are unique, as the original jurors who
> personally listened to the first stage testimony and directly reviewed the
> evidence of guilt/innocence have been replaced with new jurors who are
> wholly unfamiliar with that evidence. Thus, any lingering doubts that existed
> are gone, for all intents and purposes.

Id. Accordingly, the OCCA held as follows:

> [W]e find it improper for the issue of residual doubt to make its way into a
> capital resentencing proceeding to the extent [Petitioner] argues here. As this
> Court held in Bernay, evidence relating to residual doubt is "not relevant to the
> defendant's character, record, or any circumstance of the offense." Of course,
> jurors in a resentencing proceeding will always be able to consider the weight

---

[5] At the second resentencing, the State presented its own expert who also analyzed the
victim's fingernails. She did not find any male DNA (Tr. 7/21/03, 719-30).

of the evidence in deciding punishment. However, resentencing proceedings should not be viewed as a second chance at revisiting the issue of guilt.

Id. at 298-99 (footnote omitted).

In Petitioner's appeal of his third resentencing, Petitioner raised the claim he now raises here. The OCCA disposed of it as follows:

In Rojem 2, discussing the 2003 resentencing trial, we noted that this exact evidence went to residual doubt of [Petitioner's] guilt. We held in that case that residual doubt evidence is not admissible in a capital resentencing trial where its only purpose is to re-raise the question of a defendant's guilt. [Petitioner] encourages this Court to reconsider that decision and find that residual doubt evidence is appropriate in capital resentencing cases. We decline the invitation. Although the trial court misapplied the law regarding presentation of evidence by transcript in capital resentencing cases, [Petitioner] suffered no harm because the evidence was inadmissible as going to residual doubt.

Rojem, 207 P.3d at 392-93 (footnotes omitted).

In Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007), the Supreme Court made the following unqualified statement regarding the admission of residual doubt evidence: "we have *never* held that capital defendants have an Eighth Amendment right to present 'residual doubt' evidence at sentencing." Id. at 250-51 (emphasis added). In support of this statement, the Supreme Court cited its earlier decision in Oregon v. Guzek, 546 U.S. 517, 523-27 (2006). In the Guzek opinion, the Supreme Court discussed its Eighth Amendment case law, giving particular attention to its holding in Lockett v. Ohio, 438 U.S. 586 (1978). Guzek, 546 U.S. at 523-24. In Lockett, the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case,

not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 F.3d at 604 (footnotes omitted). However, despite this broad statement in Lockett governing the admission of mitigating evidence, the Supreme Court in Guzek found that it had never construed the Eighth Amendment as encompassing the right to present evidence of residual doubt. Guzek, 546 U.S. at 523, 525.

Because both Abdul-Kabir and Guzek make clear that Petitioner has no Eighth Amendment right to present residual doubt evidence, Petitioner has no valid argument that the OCCA's decision in his case is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Court is also not persuaded by Petitioner's additional argument that the DNA evidence he sought to present was not residual doubt evidence, but general mitigating evidence relevant to two of the alleged aggravators (murder to avoid arrest and heinous, atrocious, or cruel). The evidence in question clearly related to Petitioner's guilt, which had previously been determined.

In addition, the exclusion of the evidence in question does not cause the Court to question the reliability of Petitioner's resentencing proceeding. Contrary to Petitioner's contention, his case is not similar to the circumstances presented in Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001). In Mitchell, the petitioner was granted a new capital

24

resentencing proceeding after his murder-related convictions for rape and sodomy were found constitutionally infirm. Id. at 1044, 1060-66. Because the charges were so intertwined, the Tenth Circuit could not "be confident that the jury would have returned [a death] sentence had no rape and sodomy evidence been presented to it." Id. at 1065. Unlike Mitchell, Petitioner's related convictions for kidnapping and rape have not been invalidated based on false and misleading forensic expert testimony and the DNA evidence Petitioner relies on does not undermine their validity. Id. at 1064. All of Petitioner's convictions were based on circumstantial evidence, which the Tenth Circuit found to be constitutionally sufficient and reliable. Rojem, 245 F.3d at 1141-42.

For the foregoing reasons, the Court concludes that Petitioner's Ground Three lacks merit. Relief is therefore denied.

**D.      Ground Four:      Loss of a Peremptory Challenge.**

In Ground Four, Petitioner asserts that he was denied due process when he was required to use one of his nine peremptory challenges to remove a juror he contends should have been removed for cause. Petitioner raised this claim on direct appeal. Finding that the trial court did not abuse its discretion in refusing to excuse the juror, the OCCA denied relief. Rojem, 207 P.3d at 388-89. In response, not only does Respondent assert that Petitioner's claim should be denied under AEDPA deference, but she additionally contends that because Petitioner has failed to make any argument that his jury was not impartial, he has failed to plead a federal constitutional claim for which habeas relief may be granted.

In Ross v. Oklahoma, 487 U.S. 81, 88 (1988), the Supreme Court "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." Because a defendant has no constitutional right to peremptory challenges and because their very purpose is to ensure that an impartial jury is achieved, "the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." Id. Thus, Ross makes it clear that the Sixth Amendment focus is not on the juror who was removed by a peremptory challenge, "but on the jurors who ultimately sat[,]" and relief is only warranted when a defendant shows that his jury was not impartial. Id. at 86.

In his Petition, Petitioner focuses solely on the juror he claims should have been excused for cause. He makes no assertion that his use of a peremptory challenge to remove the juror resulted in a resentencing proceeding before a jury that was not impartial.[6] Because Petitioner makes no claim that he was tried before a jury that was not impartial, Respondent is correct that Petitioner has failed to demonstrate his entitlement to relief. As the Supreme Court found in Ross,

> As required by Oklahoma law, petitioner exercised one of his peremptory challenges to rectify the trial court's error, and consequently he retained only eight peremptory challenges to use in his unfettered discretion.

---

[6] Even after Respondent alerted Petitioner to this deficiency in her Response, Petitioner did not further plead the issue in his Reply.

But he received all that Oklahoma law allowed him, and therefore his due process challenge fails.

Id. at 90-91 (footnote omitted).  Ground Four is therefore denied.[7]

### E.    Ground Five:        Mitigation Instruction.

In Ground Five, Petitioner asserts that the trial court gave a uniform jury instruction which prevented the jury from considering all of his mitigating evidence.  Petitioner raised this claim on direct appeal, but the OCCA denied relief.  Rojem, 207 P.3d at 395-96. Petitioner contends that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law, particularly Tennard v. Dretke, 542 U.S. 274 (2004). While not directly addressing the application of Tennard, Respondent asserts that the OCCA's decision is in line with the Supreme Court's decisions in Ayers v. Belmontes, 549 U.S. 7 (2006), Brown v. Payton, 544 U.S. 133 (2005), and Boyde v. California, 494 U.S. 370 (1990), because the OCCA reasonably concluded that the instruction in question did not confuse or mislead the jury in its consideration of Petitioner's mitigating evidence.

The instruction in question is Instruction No. 27, and Petitioner takes issue with the following portion of the instruction: "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame" (O.R. 16, 3134).  Zoning in on this single sentence, Petitioner contends that it, and

---

[7]  This Court has not found that the trial court erred in refusing to excuse the juror about whom Petitioner complains, nor has it addressed the OCCA's conclusion that no error occurred. Because Petitioner has failed to argue that his jury was not impartial, the claim fails without the need to address these matters.

it alone, prevented the jury from considering his non-crime-related mitigation: "No reasonable jurist could read Instruction No. 27 as permitting consideration of 'non-crime' mitigating factors." Petition, p. 58. Specifically, Petitioner argues that this language "shackled the defense" by foreclosing the jury from considering the

> compelling mitigation evidence listed in Instruction No. 28, including evidence that he performed thoughtful acts of kindness for friends, family and society and has shown a potential for rehabilitation and for contributing affirmatively to the lives of his family, friends, and fellow inmates, and can make a contribution to society while in prison.

Petition, pp. 58, 60.

In denying Petitioner relief, the OCCA acknowledged that the challenged instruction given in Petitioner's case had since been modified based on its decision in <u>Harris v. State</u>, 164 P.3d 1103 (Okla. Crim. App. 2007). <u>Rojem</u>, 207 P.3d at 395-96. In <u>Harris</u>, the OCCA addressed the same issue raised in Petitioner's case, and while the OCCA rejected the argument that "the current uniform jury instruction prohibits jurors from considering mitigating evidence[,]" <u>Harris</u>, 164 P.3d at 1113, it nevertheless acknowledged that there had been instances where prosecutors had played upon the language of the instruction in an attempt to limit a jury's consideration of a defendant's mitigating evidence.[8]

---

[8] The OCCA specifically referenced the Tenth Circuit's decision in <u>Le v. Mullin</u>, 311 F.3d 1002 (10th Cir. 2002). <u>Harris</u>, 164 P.3d at 1113 n.38, 1114 n.41. After detailing established precedent on a defendant's right to present mitigating evidence, the OCCA stated its agreement "with the Tenth Circuit's conclusion that any attempt to limit a jury's consideration of mitigating evidence only to that evidence which may make a defendant less guilty, or the crime less horrible, is unconstitutional. This is true whether the attempted limitation occurs through instruction or argument." <u>Id.</u> at 1113 (footnote omitted).

This Court is troubled . . . by the consistent misuse of the language in this instruction in the State's closing arguments. This Court noted in Frederick v. State that the prosecutor could argue mitigating evidence did not reduce a defendant's moral culpability or blame. However, we did not intend to suggest that prosecutors could further argue that evidence of a defendant's history, characteristics or propensities should not be considered as mitigating simply because it does not go to his moral culpability or extenuate his guilt. This would be an egregious misstatement of the law on mitigating evidence.

Id. at 1114 (footnote omitted). Consequently, in an effort to "clarify" the instruction and to "discourage improper argument[,]" the OCCA determined that the instruction should be amended.[9] Id. Despite the amendment, however, the OCCA denied relief in Petitioner's case, as it did in Harris:

We note that, unlike Harris,[10] the prosecutors in [Petitioner's] case did not use the old language to improperly argue jurors should disregard mitigating evidence. That is, in [Petitioner's] case there was no misstatement of law which might have confused jurors or misled them regarding their ability to consider [Petitioner's] mitigating evidence. The trial court did not err in instructing the jury using the then-standard uniform instruction.

Rojem, 207 P.3d at 396.

As noted above, Petitioner contends that he is entitled to habeas relief on this claim because the OCCA's decision is contrary to or an unreasonable application of Tennard. In

---

[9] Thereafter, and in accordance with the language proposed in Harris, 164 P.3d at 1114, the instruction, OUJI-CR (2d) 4-78, was amended in pertinent part as follows: "Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty."

[10] In Harris, the OCCA found that one of the prosecutors made improper argument with regard to the jury's consideration of the defendant's mitigating evidence; however, the OCCA concluded that the error was harmless due to legally accurate comments made by a second prosecutor in final closing argument as well as the instructions given. Harris, 164 P.3d at 1113-14.

Tennard, the defendant presented only one witness in mitigation. This witness, the defendant's parole officer, testified that the defendant had an IQ of 67. The defense argued that the defendant's IQ was relevant to his "limited mental faculties and gullible nature [which] mitigated his culpability[.]" However, the prosecution argued that the evidence was irrelevant because the only questions before the jury were the two special issues that the trial court directed the jury to consider, namely, whether the murder was deliberate and whether the defendant was a continuing threat. Tennard, 542 U.S. at 277-78. After the jury answered both questions in the affirmative and Tennard was sentenced to death, Tennard appealed, arguing that despite being permitted to present evidence of his IQ in mitigation, the instructions given prevented the jury from "'consider[ing] and giv[ing] effect to that evidence in imposing sentence.'" Id. at 278 (quoting Penry v. Lynaugh, 492 U.S. 302, 319 (1989)).

The question before the Supreme Court was the Fifth Circuit's denial of a certificate of appealability (COA) to Tennard's claim. In denying a COA, the Fifth Circuit applied a "screening test" – "a threshold inquiry into whether the petitioner presented constitutionally relevant mitigating evidence, that is, evidence of a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own, and evidence that the criminal act was attributable to this severe permanent condition." Tennard, 542 U.S. at 281, 283 (internal quotation marks omitted) (citation omitted). Because Tennard's IQ evidence did not meet this test, the Fifth Circuit denied a COA. Id. at 281.

Ruling in favor of Tennard, the Supreme Court rejected the Fifth Circuit's screening test because it had "no foundation in" and was "inconsistent with" its Eighth Amendment decisions. Id. at 284, 285, 289. In so doing, it (1) acknowledged the low relevance threshold for the admission of mitigating evidence, id. at 284 (discussing McKoy v. North Carolina, 494 U.S. 433, 440-41 (1990)); (2) reaffirmed that "[o]nce this low threshold for relevance is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence," Tennard, 542 U.S. at 285 (quoting Boyde, 494 U.S. at 377-78)); and (3) found that when a defendant asserts that his Eighth Amendment right to present mitigating evidence has been infringed, "the question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death," id. at 287 (internal quotation marks omitted) (quoting Skipper v. South Carolina, 476 U.S. 1, 5 (1986)).

Contrary to Petitioner's assertion, the OCCA's determination that the mitigation instruction given in his case was legally accurate is not akin to the appellate screening test rejected in Tennard. See Payton, 544 U.S. at 141 ("A state-court decision is contrary to [the Supreme] Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in [its] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result.") (citing Williams, 529 U.S. at 405, and Early v. Packer, 537 U.S. 3, 8 (2002)). In addition, for the reasons set forth below, the OCCA's decision is not an unreasonable application of

Tennard and its reaffirmation of the Eighth Amendment principles governing a defendant's right to present mitigating evidence. Id. ("A state-court decision involves an unreasonable application of [the Supreme] Court's clearly established precedents if the state court applies [the Supreme] Court's precedents to the facts in an objectively unreasonable manner.") (citing Williams, 529 U.S. at 405, and Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)).

In Boyde, a case relied upon in Tennard, the Supreme Court addressed the very claim raised by Petitioner here, i.e., an Eighth Amendment claim that jury instructions prevented the jury from considering his "non-crime-related" mitigation evidence. Boyde, 494 U.S. at 372, 375, 377-378. In Boyde, the Supreme Court determined that the claim should be reviewed under the following standard: "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id. at 380. The Court explained:

> Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in

the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Id. at 380-81 (footnote omitted).

In Boyde, the Supreme Court found that no Eighth Amendment violation occurred because the instruction itself was not limiting as the defendant suggested, and in light of other instructions given, it was "improbable that jurors would arrive at an interpretation that precludes consideration of all non-crime-related evidence." Id. at 382-83. The Court also found that given all of the mitigating evidence presented by the defense, it was "unlikely that reasonable jurors would believe the court's instructions transformed all of this 'favorable testimony into a virtual charade.'" Id. at 383 (quoting California v. Brown, 479 U.S. 538, 542 (1987)). And finally, the Supreme Court referenced the arguments made by the parties. Although the prosecution had argued against the weight of the defendant's mitigating evidence, he never suggested that it should not be considered. In addition, defense counsel "stressed a broad reading" of the mitigation instruction. Id. at 384-86. In light of all of these circumstances, the Supreme Court "conclud[ed] there [was] not a reasonable likelihood that the jurors . . . understood the challenged instructions to preclude consideration of relevant mitigating evidence . . . ." Id. at 386. See also Belmontes, 549 U.S. at 12-24 (applying Boyde and Payton and finding no Eighth Amendment violation); Payton, 544 U.S. at 141-47 (applying Boyde and finding no Eighth Amendment violation).

As in Boyde, Payton, and Belmontes, the circumstances in Petitioner's case support the OCCA's finding that Petitioner's jury was not prevented from considering all of

Petitioner's mitigating evidence. First, examining the instructions as a whole, it is clear that the jury was aware of its duty to consider not only the mitigating circumstances alleged by Petitioner, but any other circumstances it deemed mitigating (O.R. 16, 3134-36). In addition, the jury was instructed that in the sentencing phase, it was permitted to consider "sympathy or sentiment for the defendant in deciding whether to impose the death penalty" (O.R. 16, 3139). Second, it is simply unreasonable to conclude that the single instruction complained of by Petitioner caused the jury to put aside the testimony of some fifteen witnesses presented by Petitioner in mitigation. To do so, the jury "would have had to believe that the penalty phase served virtually no purpose at all." Payton, 544 U.S. at 144. Finally, having reviewed the parties' closing arguments, the Court finds that the jury was not misled in any way regarding consideration of Petitioner's mitigating evidence. Under these circumstances, and given that the jury obviously relied on non-crime-related mitigating evidence in rejecting the continuing threat aggravator, the Court finds Petitioner has not shown that his jury was impermissibly prevented from considering all of his mitigating evidence nor that the OCCA's denial of this claim resulted in a decision that was contrary to or an unreasonable application of Supreme Court law. Accordingly, Petitioner's Ground Five is denied.

**F.    Ground Six:        Jury's Weighing of Aggravators and Mitigators.**

In Ground Six, Petitioner asserts that Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), require Oklahoma capital juries to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating

circumstances. When the trial court refused to so instruct the jury in Petitioner's case, Petitioner presented the issue to the OCCA. Because the OCCA denied relief, Rojem, 207 P.3d at 396, Petitioner asserts that he is entitled to relief from this Court because the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

Petitioner's very claim has twice been rejected by the Tenth Circuit. In Matthews v. Workman, 577 F.3d 1175, 1195 (10th Cir. 2009), an Oklahoma capital habeas petitioner, relying on both Apprendi and Ring, argued that his jury should have been instructed to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Without this determination, Matthews argued his death sentence was invalid. Relying on its decision in United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007), the Tenth Circuit found no merit to the claim. In particular, the Court found that the jury's weighing of the aggravating and mitigating factors "is not a finding of fact subject to Apprendi but a 'highly subjective, largely moral judgment regarding the punishment that a particular person deserves.'" Matthews, 577 F.3d at 1195 (quoting Barrett). In Lockett, 711 F.3d at 1252-55, the Tenth Circuit reaffirmed its position on this issue. In addition, the Court notes that all of Oklahoma's federal district courts have similarly held. See Fitzgerald v. Trammell, No. 03-CV-531-GKF-TLW, 2013 WL 5537387, at *59 (N.D. Okla. Oct. 7, 2013); Jackson v. Workman, No. 08-CV-204-JHP-FHM, 2013 WL 4521143, at *27 (N.D. Okla. Aug. 26, 2013); Cole v. Workman, No. 08-CV-328-CVE-PJC, 2011 WL 3862143, at *51-52 (N.D. Okla. Sept. 1, 2011); Dodd v. Workman, No. CIV-06-140-D,

2011 WL 3299101, at *55-57 (W.D. Okla. Aug. 2, 2011), *overruled on other grounds by*

Dodd v. Trammell, 753 F.3d 971 (10th Cir. 2013); Primeaux v. Workman,

No. CIV-05-224-C, 2010 WL 3942395, at *32-33 (W.D. Okla. Oct. 7, 2010); DeRosa v.

Workman, No. CIV-05-213-JHP, 2010 WL 3894065, at *32-33 (E.D. Okla. Sept. 27, 2010);

Murphy v. Sirmons, 497 F.Supp.2d 1257, 1277-78 (E.D. Okla. 2007).   In light of this

abundant authority, the Court finds that Petitioner has failed to demonstrate his entitlement

to relief.  Ground Six is therefore denied.

G.      **Ground Seven:      Ineffective Assistance of Appellate Counsel.**

In Ground Seven, Petitioner alleges that his appellate counsel was ineffective for

failing to include two claims of trial counsel ineffectiveness on direct appeal.  Petitioner

presented this argument to the OCCA in his first post-conviction application.  The OCCA

denied relief on the merits.  Rojem, No. PCD-2007-895, slip op. at 2-3, 5-8.  Because

Petitioner has failed to show that the OCCA's denial of relief is contrary to or an

unreasonable application of Supreme Court law, the Court finds that Petitioner's request for

relief must be denied.

1.      **Applicable Supreme Court Law.**

Claims regarding the effectiveness of appellate counsel are governed by Strickland v.

Washington, 466 U.S. 668 (1984).  Milton v. Miller, 744 F.3d 660, 669 (10th Cir. 2014)

(citing Smith v. Robbins, 528 U.S. 259, 285 (2000)).  In accordance with Strickland, a

petitioner alleging appellate counsel ineffectiveness must show (1) that his appellate

counsel's actions on appeal were objectively unreasonable and (2) that, but for counsel's unreasonable actions, he would have prevailed on appeal. Robbins, 528 U.S. at 285-86; Miller v. Mullin, 354 F.3d 1288, 1297 (10th Cir. 2004) (quoting Ellis v. Hargett, 302 F.3d 1182, 1186-87 (10th Cir. 2002). When counsel has filed a brief on the merits, it is difficult to show his incompetence for failing to raise a particular claim. Robbins, 528 U.S. at 288. Appellate counsel does not have an obligation to raise every possible claim irrespective of its merit. In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). "This has assumed a greater importance in an era when oral argument is strictly limited in most courts–often to as little as 15 minutes–and when page limits on briefs are widely imposed." Jones, 463 U.S. at 752-53.

In order to evaluate appellate counsel's actions, the omitted issues must be examined. With respect to the omitted issue, the Tenth Circuit has provided the following guidance:

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003) (footnote omitted) (citations omitted).

## 2. Trial Counsel's Failure to Object to an <u>Allen</u>[11] Instruction.

Petitioner asserts that his jury was coerced into a verdict in violation of <u>Lowenfield v. Phelps</u>, 484 U.S. 231 (1988), and that his trial counsel was ineffective for failing to recognize it and so object at trial. Ultimately, Petitioner faults his appellate counsel for failing to raise this issue of trial counsel ineffectiveness.

As noted above, Petitioner presented this claim to the OCCA on post-conviction. In addressing Petitioner's appellate counsel claims, the OCCA applied the following standard of review, citing relevant portions of the Supreme Court's decisions in both <u>Strickland</u> and <u>Robbins</u>:

> A claim of ineffective assistance of appellate counsel may be raised for the first time on post-conviction. [Petitioner] must show that counsel's performance was deficient, and that he was so prejudiced by that performance that he was deprived of a fair trial with a reliable result. We will not find counsel was ineffective where there is no prejudice from counsel's acts or omissions. A finding of prejudice requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." We defer to the strong presumption that counsel's conduct is within the wide range of reasonable professional conduct. [Petitioner] must show "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy." Within his subpropositions of error, [Petitioner] argues appellate counsel failed to raise several meritorious issues. Appellate counsel is not required to raise every non-frivolous issue.

<u>Rojem</u>, No. PCD-2007-895, slip op. at 2-3 (footnotes omitted). With respect to this particular claim, the OCCA held as follows:

---

[11] <u>Allen v. United States</u>, 164 U.S. 492 (1896). As acknowledged in <u>Darks v. Mullin</u>, 327 F.3d 1001, 1013 (10th Cir. 2003), in <u>Allen</u>, "the Supreme Court upheld the giving of a supplemental instruction to a jury unable to reach a consensus."

[Petitioner] claims in Subproposition C that appellate counsel should have claimed trial counsel was ineffective for failing to object when the trial court gave the uniform jury instruction for deadlocked capital juries. Oklahoma has two uniform jury instructions for deadlocked juries. One, OUJI-CR (2d) 10-11, is for use in noncapital trials, is closely patterned after the traditional Allen charge, and admonishes jurors not to surrender honestly held beliefs. The other, OUJI-CR (2d) 4-83, is designed for use in capital cases and does not include that language. After jurors announced they were deadlocked, with one person in favor of a sentence of life without parole and eleven recommending death, the trial court gave OUJI-CR (2d) 4-83. Counsel had requested a modified version of that same instruction, which also did not include language telling jurors not to abandon honestly held beliefs. In other words, [Petitioner] requested a version of, and the trial court gave, the uniform instruction for deadlocked capital juries, in accordance with the law. [Petitioner] now asks this Court to find appellate counsel ineffective, because appellate counsel did not claim that trial counsel should have objected and asked for a different instruction. [Petitioner] argues that the current instructions are wrong and asks this Court to adopt a capital deadlock instruction incorporating the "honestly held beliefs" language or concepts. That is, he wants the Court to review and change the underlying substantive law in order to support his claim of ineffective assistance. We will not do so. The issue before us is whether appellate counsel was ineffective for failing to claim that trial counsel erred by agreeing to use of the appropriate uniform instruction. We find counsel was not ineffective.

Id. at 7-8 (footnote omitted). For the reasons set forth below, the Court finds that Petitioner has failed to show that this decision by the OCCA is contrary to or an unreasonable application of Supreme Court law.

Initially, the Court must address Petitioner's assertion that the OCCA failed to render a decision on the merits in its denial of Petitioner's claim. This assertion is completely without merit. Clearly, the OCCA addressed the merits of the claim, giving particular attention to the underlying substantive claim which Petitioner asserts appellate counsel should have raised. Contrary to Petitioner's assertion, the OCCA did not refuse to hear the

39

claim – what it refused to do was change its substantive law on the underlying claim so that

Petitioner could prevail.  Pursuant to Okla. Stat. tit. 21, § 701.11, "[i]f the jury cannot, within

a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a

sentence of imprisonment for life without parole or imprisonment for life."  The instruction

given in Petitioner's case, OUJI-CR (2d) 4-83[12], reflects this statutory pronouncement, and

the OCCA has held that it is the instruction which should be given when a capital jury is

deadlocked on the issue of punishment.  Hooks v. State, 19 P.3d 294, 312 (Okla. Crim. App.

2001).  See also Harris v. State, 84 P.3d 731, 756 (Okla. Crim. App. 2004) ("Indeed, we have

held that where a capital jury is deadlocked on the issue of punishment, the trial court should

give the deadlock instruction specific to capital sentencing proceedings, OUJI-CR (2nd)

4–83, which is patterned after § 701.11.") (citing Hooks).   Because the jury was properly

instructed in accordance with Oklahoma law, the OCCA held that Petitioner's appellate

counsel was not ineffective for failing to raise a trial counsel claim regarding the given

instruction.

Having rendered a decision on the merits, the question is whether that decision was

reasonable.  Again, because the jury was properly instructed under Oklahoma law, the OCCA

could reasonably conclude that Petitioner was not denied the effective assistance of trial or

---

[12] In Petitioner's case, the uniform instruction was given verbatim: "If on further deliberation you are unable to agree unanimously as to punishment, I shall discharge you and impose a sentence of imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole" (O.R. 16, 3145).

appellate counsel.  Had the claim been raised on direct appeal, Petitioner would not have prevailed.  <u>Robbins</u>, 528 U.S. at 285.

The Court additionally finds that Petitioner has not shown that Oklahoma's standard instruction for deadlocked capital juries violates <u>Lowenfield</u> because it fails to contain the "honestly held beliefs" language.  <u>Lowenfield</u> protects a defendant's right against a coerced verdict.  It does not, however, require any particular language. "In resolving whether any particular <u>Allen</u> charge crossed over the boundaries of propriety to coercion, reviewing courts must 'consider the supplemental charge given by the trial court in its context and under all the circumstances.'"  <u>Hooks v. Workman</u>, 606 F.3d 715, 732 (10th Cir. 2010) (quoting <u>Lowenfield</u>, 484 U.S. at 237).  In <u>Darks</u>, the Tenth Circuit reviewed an instruction containing the very language used in Petitioner's case and found that it did not coerce the jury's verdict. <u>Darks</u>, 327 F.3d at 1012, 1014.

> First, nothing in the language of the supplemental instruction itself can be deemed coercive. Although it lacked protective language assuring minority jurors they were not required to relinquish firmly held convictions, it did not include any language asking the jurors to reconsider their positions and to change their positions if they believed they were wrong. The instruction did not press the hold-out juror to yield to the majority position. When, as here, a neutrally phrased supplemental instruction is directed at all jurors rather than just those holding a minority view, and encourages them to continue deliberations, it reduces the possibility of coercion.

<u>Id.</u> at 1014 (citations omitted).  As in <u>Darks</u>, the Court finds that the instruction given in Petitioner's case did not coerce the jury to return a death sentence.  The Court also finds that

the circumstances in Petitioner's case did not result in a coerced verdict (O.R. 16, 3143-46; Tr. IV, 1140-48).

### 3. Trial Counsel's Failure to Object to the Jury's Smoke Break.

Petitioner's second allegation of error against his appellate counsel concerns a smoke break taken by the jury during deliberations. Petitioner asserts that in accordance with Oklahoma law, had trial counsel objected to the smoke break given by the trial court, prejudice would have been presumed, and he would have been entitled to a new trial. Petitioner therefore faults his appellate counsel for failing to raise this issue of trial counsel ineffectiveness.

In denying relief, the OCCA noted that "appellate counsel's decision not to raise the issue on appeal may have been strategic." Rojem, No. PCD-2007-895, slip op. at 6. The OCCA then offered the following explanation:

> We have held that infrequent and brief separations during deliberations, where jurors are accompanied by court personnel, do not constitute separation of the jury in violation of 22 O.S.2001, § 857. Warner v. State, 2006 OK CR 40, 144 P.3d 838, 875. Appellate counsel interviewed several jurors regarding the smoke break and, if those interviews are accurately reflected in the juror affidavits provided by the State, discovered there was no improper communication. Respondent's Brief, Exhibits 1, 5, 10, 12. This suggests appellate counsel made a strategic decision not to raise the claim.

Id. at 6 n.23.

In his challenge to the OCCA's decision, Petitioner repeatedly states that the omitted issue was an automatic winner, i.e., had appellate counsel raised the claim, he would have been entitled to a new trial. In support of this assertion, Petitioner cites to the OCCA's

decision in <u>Johnson v. State</u>, 93 P.3d 41 (Okla. Crim. App. 2004). Petition, p. 85; Reply, pp. 23, 25. However, in <u>Johnson</u>, the OCCA did not find that a violation of Title 22, Section 857, results in automatic reversal. In <u>Johnson</u>, the OCCA noted the important interests protected by Section 857 and it reaffirmed that the language contained therein was mandatory. However, it went on to state that "when a violation of this statute occurs over defense objection prejudice is presumed *and the burden falls to the State to prove otherwise*." <u>Johnson</u>, 93 P.3d at 47 (emphasis added).

Petitioner also challenges the OCCA's suggestion that omission of the issue may have been strategic. Petitioner argues that this finding could not have been made from the record before the OCCA. Petitioner additionally asserts that the only way the OCCA could have made this finding was through an evidentiary hearing.

The record reflects that in support of this claim on post-conviction, Petitioner provided two affidavits. Original Application for Post-Conviction Relief, Case No. PCD-2007-895, Exhibits 3 and 5. Both affidavits were executed by attorneys who were then employed by the Oklahoma Indigent Defense System (OIDS) and who were present at Petitioner's trial during jury deliberations. Both reference the smoke break and the jurors who went outside. Both acknowledge that the jurors were accompanied by two women they believed to be employees of the Court Clerk.[13] Both state that they saw the court employees conversing with the jurors. One states that she saw two jurors participating in a "comforting

---

[13] One acknowledges that she "observed the other jurors remaining in the courtroom or the jury deliberation room under the care of the bailiff." Exhibit 3.

hug."  Petitioner did not provide any affidavits from the jurors or court personnel, and although one of Petitioner's trial attorneys provided an affidavit (Exhibit 4), it did not relate to the jury separation issue.

In response to an order from the OCCA directing the State to respond to Petitioner's application for post-conviction relief, the State provided fifteen affidavits, which included an affidavit from each juror who sat on Petitioner's trial and affidavits from the Court Clerk and two of her deputies. Response to Petitioner's Original Application for Post-Conviction Relief, Case No. PCD-2007-895, Exhibits 1-15.  In addition to statements by four jurors that they had been contacted by OIDS and questioned about the break (as referenced in the OCCA's decision), all twelve jurors stated that no improper contact and/or case discussions occurred during breaks.  All three court employees made statements as to their trial responsibilities and how those trial responsibilities were carried out in Petitioner's case.

Contrary to Petitioner's assertion, the record before the OCCA supports its suggestion that appellate counsel may have made a strategic decision not to include the claim on appeal after learning from interviews conducted with some of the jurors that nothing improper occurred during the smoke break.  In addition, there is no requirement that the OCCA order an evidentiary hearing before evaluating an ineffectiveness claim and making a determination regarding strategy.  Pursuant to the OCCA's rules, affidavits submitted by the parties are a part of the post-conviction record, and an evidentiary hearing is only warranted if the OCCA

determines that there are "issues of fact [which] must be resolved by the District Court." Rule 9.7(D)(1), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App.

Petitioner's arguments also overlook the fact that the OCCA did not solely reject his claim based on a finding of strategy. While the OCCA suggested that omission of the issue might have been strategic, it also denied relief in light of precedent standing for the proposition "that infrequent and brief separations during deliberations, where jurors are accompanied by court personnel, do not constitute separation of the jury in violation of [Section 857]." Rojem, No. PCD-2007-895, slip op. at 6 n.23 (citing Warner v. State, 144 P.3d 838, 875 (Okla. Crim. App. 2006)). In Warner, 144 P.3d at 875, the OCCA found that "the recesses were so infrequent and short in duration that such did not constitute a separation of the jury during deliberations within the meaning of § 857." In Warner, the OCCA additionally found that even if "there was commingling with non-jurors, the State adequately rebutted any presumption of prejudice as the testimony showed the jury was not exposed to any outside or prejudicial influences during deliberations." Id. In light of Warner, and given the evidence presented by both parties on post-conviction, the OCCA could reasonably determine that Petitioner was not denied the effective assistance of appellate counsel because had the claim been raised on direct appeal, Petitioner would not have prevailed. Robbins, 528 U.S. at 285.

### 4. Conclusion.

For the reasons set forth above, the Court finds that Petitioner has failed to demonstrate his entitlement to relief. The OCCA reviewed Petitioner's allegations of appellate counsel ineffectiveness on the merits, and Petitioner has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law. In sum, Petitioner's Ground Seven does not evidence an "extreme malfunction[]" which would warrant the granting of habeas relief. Richter, 131 S. Ct. at 786. Ground Seven is therefore denied.

### H. Ground Eight: Cumulative Error.

In his final ground, Petitioner asserts that he is entitled to relief on a theory of cumulative error. In support of his claim, Petitioner points to the errors alleged in his Grounds Two, Three, and Five. However, with respect to these grounds, error was only found in Ground Two. On direct appeal, the OCCA determined this error to be harmless, Rojem, 207 P.3d at 389-92, and applying Brecht, this Court has likewise determined that no relief is warranted. Because cumulative error by its very nature requires more than one error to accumulate, Petitioner's cumulative error claim has no merit. Hooks v. Workman, 689 F.3d 1148, 1195 (10th Cir. 2012). Ground Eight is denied.

### IV. Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief.

Accordingly, Petitioner's Petition (Doc. 41) is hereby **DENIED**. A judgment will enter accordingly.

IT IS SO ORDERED this 30th day of September, 2014.


_____
VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE